The next argument is in Appeal No. 05-5128, Blackstone Consulting Inc v. United States. Mr. Cox, good morning. Welcome. Please proceed. Good morning. May it please the Court, this case, hopefully, is far simpler than the last. There's no mention of flanges or trunches. What we're dealing with here is a seemingly simple settlement agreement that revolved around some mess hall services in Yuma, Arizona. The problem in the case comes in when the parties have different interpretations regarding the settlement agreement. On the one hand, Blackstone alleges that the agreement contained two material terms. One was that it would be provided two years of directed subcontract work at Yuma. Where is that provision in the agreement? Let me direct the Court's attention to, if we look at page 96 of the joint appendix, it's kind of an awkward agreement in the sense that there was no formal settlement agreement. There was just some letters exchanged and an amendment to the solicitation that was issued that contained the language of the negotiations. And the document at page 96 of the joint appendix was the contracting officer's offer to Blackstone, where he sets forth the terms of the offer. And if the Court looks at the first full paragraph, Mr. Sando, the contracting officer, states that the reasons for establishing this time frame are twofold. He talks about first his thought that the two-year period would be sufficient to help Blackstone with any potential prejudice so that he would suffer because of the release of this proprietary information. The problem I have with your case is that the agreement, as voiced by the contracting officer, had two goals or assumed that two goals would be achieved. But it only had one provision, not two, and the provision covered the time period 2002 to 2004. In effect, you're saying, well, we were actually entitled to 2004 to 2006 as well, because unless we get that second pair of years, the second goal described by the CEO won't be achieved. And, of course, that's quite true, that it won't be achieved unless there is a further two-year period. But the actual offer, as I read it, was simply for a directed procurement to cover the two-year period from 2002 to 2004. So I'm having trouble seeing how the government reached, because they did give your client 2002 to 2004. They just didn't also give him 2004 to 2006, but they never promised that they would. They might have made such a promise if you had been negotiating an actual settlement agreement document. I'm quite sure you would have put in different time periods for the different goals in case they weren't coterminous. But, of course, you weren't involved. The business owner used his own business judgment and his own drafting skills. But he accepted, as I read his letter, the terms as proposed by the contracting officer, which effectively was a directed procurement only through 2004, not through 2006 or 2008 or some other date. How do you get around that? With all due respect, I just want to correct a factual – I think you get the facts a little bit wrong, Your Honor. The government did not give Blackstone anything. They never gave him two years of any work. The two-year period that Blackstone was on the base working was – Blackstone was previously the prime contractor at Yuma. So when all these protests started taking place, the government extended its services along with all the rest of the contractors on the base until the protests had been resolved. And that was the period of time between 2000 to 2002. What Blackstone is asking for is the period of time between 2002 to 2004, essentially asking the government to give us the two years that we bargained for. Blackstone gave up the rights to its protests, and in the protests it was asking for eight years because this is an eight-year contract. Well, you keep referring to the two years we bargained for, but this all started from the inadvertent release of your client's proprietary data. And the proposal, as I read this, again on page 96 of the appendix, was to – an effort to mitigate the harm, to in effect say, well, let's give you a guaranteed subcontract, pushing the date out to 2002, and by then whatever competitive advantage might have been gained will have been mitigated by the passage of time. So – and that clearly has been achieved in this scenario as it played out. In terms of the two-year period and the development of some contractual arrangement and some relationship between your client and the prime contractor, I think you can read this as simply explaining why your client's exclusive arrangement wouldn't continue for the entire period of the prime contract, and why a two-year period is enough. The government explaining that, well, hopefully by then there will be a contractual arrangement of some sort, but if anything, that second provision is as much a protection of the prime contractor as it is anything else. So the prime contractor wouldn't be saddled with some exclusive arrangement for the full period. And I don't see that that's a guarantee of a two-year exclusive provision. I don't see how you can possibly read that. Well, Your Honor, once again, it's kind of an awkward situation because there is no formal settlement agreement, as I mentioned. This letter that we're looking at on page 96 is the contracting officer's offer, and as Your Honor points out, he's explaining in his rationale why he thinks two years is fair. Blackstone disagreed, and I think Judge Firesaw mentioned in their decision that Blackstone didn't agree with that. They thought that the harm would be on the two years, that they weren't just harmed in that procurement, but they'd be harmed for years to come because . . . But that's not before us. That's not the case before us, is it? You're not challenging that decision to only extend it for two years, right? I understand, Your Honor. But Blackstone's position here is that how could it possibly have the ability to get more years than the first two if it never had the opportunity to establish a relationship with the prime contractor to begin with? The government said, we're not going to give you eight years. We'll give you two years. And as a compromise, we'll let you work with the prime for a two-year period, assuming that you're both happy with each other, and you'll get six more years potentially. And Blackstone was never given that opportunity to do that. No, but the only thing that the understanding actually included was the provision of the deadline, the September 30, 2002 deadline. In other words, your client was guaranteed that whatever competitive disadvantage might have come from the disclosure of this information would be mitigated by the passage of time . . . And that up until that period of time had passed, that your client would be protected. That's the only provision that's in this arrangement. There's nothing that says, well, you get a two-year window of exclusivity no matter what. The whole purpose here was not to give exclusivity, but was to mitigate the harm from the inadvertent release. And that harm would be mitigated by the passage of time, period. And that's all we have. I don't see where there's any ambiguity. And I don't know where you can argue from there. Well, if I may, Your Honor, Blackstone's position is that there is an ambiguity. It's a latent ambiguity. And the ambiguity is that the contract did not anticipate what effect any delays in the procurement would have. Now, the government drafted the agreement. It should be construed against the contracting officer. And when I refer to the agreement again, I'm referring to the amendment to the solicitation because that's all we have. And what Blackstone is saying is that the ambiguity did not become obvious until 2002, when after the protests had all been resolved . . . And the parties got back together and he said, all right, what are we going to do now? How are we going to meld our agreement into the prime contract? And the contracting officer said, you know, we're done here. But, interestingly, the contracting officer, as evidence of the intent of the contracting officer . . . He didn't say, you know, you're out of luck. He said, well, I don't really want to amend the solicitation again because of all the delays, presumably. What I'm going to do, or what I have been doing, is trying to find you other work. I've been looking at these other bases to try to find you other work to do. Now, if the contracting officer felt like the intent was just that specific two-year period . . . It's curious why he would be out looking for additional two years of work for Blackstone at that time. Do you agree that your client's letter in response to what you have aptly termed the contracting officer's offer . . . I think that Mr. Blackstone's letter is an acceptance of what he thought was a two-year term. And, again, that goes to the argument regarding the latent ambiguity. He feels that the agreement was ambiguous in the sense that it did not provide for the contingency . . . Regarding, you know, what would happen if the procurement was delayed for a two-year period. Well, if the offer letter had said, we'll give you two years to protect the data and you'll have two years with the new prime . . . Then, the offer would have contained two operative rights and you would win. But, as I read the offer, as the CEO actually phrased it, it only gave two years. It didn't give two years and two years with . . . it turned out to be Mariette. And, therefore, when your client accepted the offer as extended, he got one of the rights that he might have wanted to get, but he didn't get the other. And, what he should have done, what you would have done, if you had been drafting the response . . . Would be to say, yes, the two years and there have to be two years of pairing with Mariette, so they'll see how good we are. But, he didn't say that. He said, I accept. It seems to me he's stuck with the offer as it was made. Well, Your Honor, I understand your point. I would point out again, though, that the contract officer's offer was actually two-fold. And, he uses that word. He talks about the two-year period of time. And, then he says, second, we would assume, and I'm reading from page 96. Second, we would assume and hope that Blackstone's performance will be of such quality that the prime contractor would desire to maintain the contractual relationship beyond fiscal year 02. Blackstone interpreted that to mean that's the second part of the agreement. He'll work, at that point, since there were no protests pending, all the parties presumed it would be from 2000 to 2002. And, after that, it would have, in that two-year period, had the opportunity to work with the prime and potentially get six more years of work. All right. Do you want to save your remaining two minutes of rebuttal, Mr. Connolly? Yes, thank you. Thank you very much for being responsive to the questions. Mr. Lester, good morning. Welcome back to our court. Good morning, Your Honor. This case is very simple. It's just a dispute as to whether this rather unusual contract, which is really just a series of letters rather than the standard, typical government contract where you've got government contract form. I think we have the facts clearly in mind. The only issue, Your Honor, is— What's your response to the argument? The argument essentially is there was a mistaken assumption embedded in this contract, which turned out to not be true, and, therefore, the understanding of both parties was totally upended and that there should be some relief since the assumption of both parties turned out to be belied by the actual facts. The plaintiff's interpretation, Your Honor, depends upon reading things into this agreement that are not in the express terms themselves. And in interpreting any contract, the court first looks at the plain terms and express language— Don't give us a lecture on contract law. We understand what the law is. Why wasn't there a mutual mistake? I.e., both parties were assuming that in that stipulated two-year period, Blackstone would be working with Marriott. Your Honor, the agreement was and it plainly states that the government would put in the solicitation a requirement to subcontract with Blackstone through September 30, 2002. The date is unambiguous. There's no room to debate that. But I'm saying why isn't the letter of offer that became the contract properly read to be based on an explicit assumption that the stipulated two-year period would have Blackstone paired with Marriott? And therefore, a mutual mistake by both parties to the contract, which would make the contract reformable. Well, I think, Your Honor, certainly from the recitals in the offer letter itself, it's clear that the government's intention here was to try to ameliorate the harm from the disclosure of the proprietary data that had unintentionally been disclosed. And as the contracting officer stated in the offer, by fiscal year 2003— Do you think that the letter can possibly be read to reflect an assumption by the contracting officer that the stipulated two years would not involve pairing with Marriott? Well, Your Honor, well, first of all, it wouldn't have been Marriott because there was no award decision at that point in time. Oh, who became Marriott? I think also the idea that there was a definitive two-year period here is also belied by an email that went out before this offer letter. I'm asking about the letter. Don't answer about something else. Answer about the letter. Can the letter possibly be read as assuming that the stipulated two years would not involve the prime who turned out to be Marriott working with Blackstone? The letter stated a specific deadline date. Well, we've already covered that, and I agree with you that the deadline date is wholly unambiguous. I'm asking you about a different part of the letter in which the CO seems to assume that that two-year period, that unambiguous two-year period, would involve a pairing of the prime with Blackstone so Blackstone could prove itself. Certainly one of the two recitals in the letter was to allow… Well, you can call it a recital. You can call it anything you want. I'm suggesting it's an assumption by the CO and that the Blackstone president made exactly the same assumption and that, therefore, when the facts turned out to be utterly otherwise, they both had suffered from a mutual mistake of fact. Well, I don't think there's any evidence in the record to support the idea that the contracting officer was guaranteeing a two-year period, that it was guaranteeing that a war would be made by a specific date. I'm not suggesting guaranteeing anything. I'm asking you whether it's a language reflecting a mutual mistake of fact. Certainly the letter identifies what the CO thought could be a benefit to Blackstone here, but it was only through a specific date. The government only agreed to a specific date in the solicitation. It did not obligate contractors beyond that date. You certainly aren't going to argue that we should read one sentence of the letter in isolation from the rest. All the basic law is you read the total text altogether as a single integrated document, and that's all I'm trying to do. You keep coming back to the one sentence that quite correctly, strongly favors your side, but you're not dealing with the other sentence except to say that, well, that was some extraneous comment, but it's really not part of the agreement. Well, it's not that it's not in the agreement, in the series of letters that form the agreement, but it is not the operative part of the contract. It is, as the trial court judge— Well, Your Honor, the part that I— What's your authority for saying that a contract text can be separated into operative and inoperative terms? I would refer to this Court's and the Court of Claims' decisions in the estate of Bogley and this Court's decision in Barr's back, which are cited in the government's brief as well, and this issue is also discussed in the trial court's opinion on page 15 of the appendix. The trial court talked about—and I'll quote from what the trial court said—that these other provisions—this paragraph talks about the reason—possible benefits from this agreement are, quote, subordinate to the operative part of the contract. And what the trial court was referring to was they were subordinate to the action that the government contracting officer agreed to take. What the contracting officer agreed to do was to amend the existing solicitation for mess services to include a requirement that the winner subcontract with Blackstone for the Yuma facility through September 30, 2002. The government did that. Unfortunately, there were a lot of protests, and there is no dispute or—below the trial court, the plaintiff did not dispute that these delays were not the government's fault and also did not dispute that these delays were not foreseeable at the time of the settlement agreement. But—and in fact, during this period of the delay, the plaintiff's incumbency predecessor contract as the incumbent contractor was extended through, in fact, September 30, 2002, so it actually did perform all the work that under the anticipated prime contract, Blackstone would have been entitled to anyway. But we are precluded from understanding what was agreed to evidence by the exchange of letters in the broader context that we're just limited to the date, the two-year period? Well, I think under just standard contract interpretation rules, the court looks at what was it that the parties agreed to do? What was the actual agreed to? You're not answering the question. The question is, are we precluded from looking at the broader context beyond the one sentence that you say is the entire contract? Those statements, you can certainly look at them, but those statements in and of themselves do not create independent obligations. What the obligations are are in the—basically, I'll call it the action part of the agreement where each party agrees to take certain actions. Well, why does the government want to read this obligation so narrowly when the whole course of dealing between the government authorities purchasing these food services and this contractor, Blackstone, were extremely friendly and cooperative? Blackstone is praising the government for its handling of this problem with the improper disclosure. The contracting officer is effusively apologizing for the screw-up that divulged the data. These are two parties acting in a highly friendly, mutually complementing relationship, and you would think that in that context, the government would want to maintain that high level of goodwill and cooperation and communicativeness by interpreting its agreement in a generous way, not in such a hostile way despite the friendly relationship. Well, Your Honor, if we're going to look at the equity of it, I mean, certainly the contractor did get an extra two years of work here. It got at least the work that was anticipated by this agreement. What it's looking for is an additional two years beyond that and is asking the government to pay for those additional two years. Well, the government's paying somebody to supply the food to the Marine flyers at Yuma regardless. So it's not like spend money versus don't spend money. It's a question of the same amount of money, more or less, going to be spent. Who's going to get the money? He's saying Blackstone should get it, not some other sub supplying the two mess halls for the Marines at Yuma. Well, obviously, Your Honor, first of all, our position is the contract doesn't require that. But second, it would require the government to amend the solicitation yet again, and the prime contractor. The issue here is what does the prime contractor who actually gets this contract obligated to do? There would have to be a change in that contract. So what? It's a piece of paper. You and I are good lawyers. We can do it in 90 seconds. It's not some huge burden on the government to have to change the solicitation to a prime contractor. Well, Your Honor, we don't know what the agreements that the prime had with third parties were with regard to the Yuma facility or other facilities under this contract. So I can't really speak to that type of information that's not in the record at all. I can state, though, that if, in fact, the court looks beyond simply the language of the contract itself, I mean, here, even a year later, in March of 2001, when there was an announcement of an award, which again then was later protest and delayed things again, the contractor emailed the government and again identified its recognition that it was entitled to a subcontract award through September 30, 2002. Those types of pre-dispute post-agreement understandings, to the extent that we had any ambiguity in this contract, would also indicate that the parties understood that this was just an agreement for a subcontract award through September 2002. The plain language of the agreement should control here. Over the intent of the parties, if it's clear that they had the same intent and that the intent went beyond a literal wording of the letter? Well, Your Honor, I would disagree that the plain language of the agreement itself indicates any intent to award a subcontract beyond September 30, 2002. That was the government's intent. That was, I think, what is reasonably discernible from the plain language of the agreement itself. And we would request that the court affirm the trial court's decision. Well, if we're persuaded by your interpretation of the broader intent, I'll call it, then, of course, you win. But suppose we don't agree with your interpretation of the broad intent being really no more than what the letter says. Suppose we think the broader intent was to give them a two-year audition, if you will, with the prime contractor who turned out to be Marion. If that was the broader intent, is it your position that you nevertheless win because the exact language of the CO's letter trumps the broader intent? Well, Your Honor, if you were to find that there was some kind of intent in that way, you would have to, in essence, read the September 30, 2002 date out of this contract. And that would conflict with standard contract interpretation principles to the extent that there was some kind of ambiguity in this contract. I think it's a yes answer. I think you're saying, yes, the date in the key sentence in the letter trumps any understanding of the parties, no matter how clear the court might find it to be. That's, Your Honor, because we look at the language of the agreement itself. We have to interpret it based on the language. If there's no ambiguity, then the language express terms control without reference to extraneous matters or extraneous subjective beliefs and hopes. Did Mr. Cox try to demonstrate in the court below that there was evidence extraneous to the letters, evidencing broader intent, usually on the part of the two parties? The entirety of the trial court record, absent the transcript of the hearing before the trial court judge on the arguments on the summary judgment motions, is contained in the joint appendix. There is nothing other than letters which we have referred to in our brief that indicate a definitive September 30, 2002 date. And the first time that this two-year period was mentioned was right around the time that the contract award was getting ready to be made. So there was no deposition or affidavit of the Blackstone owner as to his intent beyond what the letters said? There is an affidavit that was attached to one of the summary judgment motions, which is contained in this appendix from Mr. Blackstone stating what his subjective views were. However, his affidavit can't be read to trump the actual language of the agreement itself. Is there a responsive affidavit by the contracting officer? Do we know what his subjective intent was? Well, we can tell that from the various letters that were in the… Come on, answer the question, Mr. Lester. The question is, was there a contrary affidavit from the contracting officer, yes or no? There is his deposition. Portions of his deposition transcript are in the record. Not an affidavit, but there are deposition pages. In which he says he had a different intent from what the Blackstone president said in his affidavit? That his view was that this was a September 30, 2002 deadline. Now, Mr. Blackstone's affidavit also continually talks about he agreed to a two-year period, he agreed to a two-year period. But there is nothing from the contemporaneous records from that time period, from the 2000 time period, that support that view. The letters that went back and forth only talk about the 2002 date. There's no statement either in the offer letter, in the response letter, which accepts the offer. Was there any oral communication between the Blackstone president and the contracting officer? There's nothing in the record that indicates that beyond the initial bringing to the government's attention that there was a problem. With the unintentional disclosure. So the contract negotiation, in effect, was all by letter. All by letter. Not by meetings or phone calls or emails or other extraneous documents. That's correct. There's nothing in the record to support that. Thank you very much. Mr. Cox, you have some rebuttal time left, a little over two minutes. Unless the court has any additional questions, I would surrender my last two minutes and refer to my briefs for the remaining points. All right. Thank you, sir. We thank both counsel. The case is taken under advisement. Thank you very much. The final argument this morning is in appeal number zero.